MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2017 ME 4
Docket:      Lin-16-136
Argued:      December 13, 2016
Decided:     January 10, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, <u>MEAD</u>, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

ALLEN J. COOPER

MEAD, J.

[¶1]  Allen J. Cooper appeals from a judgment of conviction entered by the trial court (Lincoln County, *Billings, J.*) following his conditional guilty plea to a charge of unlawful possession of schedule W drugs (Class C), 17-A M.R.S. § 1107-A(1)(B)(4) (2015).[1]  The plea preserved for appeal Cooper's contention that the court erred in denying his motion to suppress evidence of drugs that he was carrying in a body cavity because law enforcement officers exceeded the authority granted them by two search warrants.  We discern no error and affirm the judgment.

---

[1] The statute has since been repealed and replaced.  P.L. 2015, ch. 496, § 6 (effective July 29, 2016) (codified at 17-A M.R.S. § 1107-A(1)(B)(4) (2016)).

## I. FACTS AND PROCEDURE

[¶2] The trial court made factual findings that are supported by the record. *See State v. Harriman*, 467 A.2d 745, 747 (Me. 1983) ("A finding of fact supporting a suppression order will not be disturbed on appeal unless clearly erroneous, that is, lacking *any* competent evidence in the record to support it." (quotation marks omitted)). Furthermore, because neither party moved for additional findings pursuant to M.R.U. Crim. P. 41A(d), we will "infer that the court found all the facts necessary to support its judgment if those inferred findings are supportable by evidence in the record," and will "consider the evidence, and reasonable inferences that may be drawn from the evidence, in the light most favorable to the trial court's judgment to determine if the evidence rationally supports the trial court's decision. In other words, we assume that the court found facts necessary to support the denial of the motion." *State v. Sasso*, 2016 ME 95, ¶¶ 18-19, 143 A.3d 124 (quotation marks and citation omitted).

[¶3] On December 29, 2014, a District Court judge issued a warrant authorizing law enforcement officers to search Cooper, his motel room in Wiscasset, and his rental car for scheduled drugs. Probable cause for the search was based on an affidavit executed by Maine Drug Enforcement Agency Special

Agent Scott Quintero describing the MDEA's lengthy investigation of Cooper to that point. Although Cooper unsuccessfully challenged the probable cause finding in the trial court, he has not maintained that challenge on appeal, nor would it have been fruitful for him to do so. *See State v. Kimball*, 2015 ME 67, ¶ 17 n.4, 117 A.3d 585 (stating that an issue not briefed is waived, subject only to obvious error review).

[¶4] Quintero and the officers working with him decided to execute the search warrant at a time when Cooper was away from his motel room and outside of his vehicle. Quintero explained at the suppression hearing that that procedure minimized the danger to both officers performing the search, and to other drivers because there would then be less chance of a high-speed chase. At about 4:00 p.m. on December 29, Quintero made contact with Cooper after Cooper and his companion stopped at a convenience store in Newcastle. As Quintero described it in his testimony at the motion hearing, "Mr. Cooper was removed from the vehicle by me, and he was handcuffed, and then we just did a pat down of his clothing at that point to look for weapons, and none were found. And then he was taken into my vehicle, he sat in the front seat, and I sat with him." Quintero said that because people involved in trafficking often conceal drugs in areas "that a police officer would be uncomfortable reaching,

4

[and] cannot easily access . . . in a public place," the store was not an appropriate location to do the full search of Cooper's person authorized by the warrant.

[¶5]    Following an approximately twenty-minute conversation in Quintero's car, during which Cooper made no admissions, Cooper was taken to the Wiscasset motel where he was staying, about twelve minutes away.  He was kept outside while a search of his second-floor room, lasting from 4:20 to 5:00 p.m., was underway; officers discovered what they described as a "piece" of Suboxone that Cooper's companion claimed was hers.  A dog certified to detect narcotics was requested from the Bath Police Department; the dog alerted on Cooper's anal area and the back seat of his car.

[¶6] Cooper was then taken to Two Bridges Regional Jail, about two miles from the motel, for a strip search.  As the search progressed, a struggle ensued when Cooper, according to Quintero, "forcefully used his right hand and forced it into his rectum area . . . aggressively trying to force his fingers further up his rectum."  Quintero swore out a new affidavit and obtained a new search warrant from a Superior Court justice authorizing imaging scans of Cooper's body and a cavity search for illegal drugs.[2]  When confronted with a CT scan

---

[2] At oral argument, the State maintained that the original search warrant authorizing a search of Cooper's person—apparently routinely requested in drug trafficking cases—gave officers the authority to conduct a medical scan and a body cavity search, and the second warrant was therefore obtained owing to "an abundance of caution."  Because the second warrant explicitly authorized

showing a bag of pills in his rectum, Cooper said, "You got me," and produced a bag containing ninety thirty-milligram oxycodone pills.

[¶7]  Cooper was indicted for unlawful trafficking in schedule W drugs (Class B), 17-A M.R.S. § 1103(1-A)(A) (2016); unlawful possession of schedule W drugs (Class C), 17-A M.R.S. § 1107-A(1)(B)(4); and trafficking in prison contraband (Class C), 17-A M.R.S. § 757(1)(B) (2016).  He moved to suppress evidence of the drugs on the grounds that (1) the first search warrant for his person and car was not supported by probable cause, (2) he was subjected to an illegal de facto arrest, (3) the CT scan was an unreasonable search, and (4) his production of the pills and his statement were involuntary. The court held a testimonial hearing and denied the motion.

[¶8]  Cooper entered a conditional guilty plea to the charge of unlawful possession of schedule W drugs pursuant to M.R.U. Crim. P. 11(a)(2), preserving his right to appeal from the denial of his motion to suppress, and the State dismissed the remaining counts.  The court entered judgment and

---

those steps, we need not address that question.  We note, however, that if the original warrant requested was intended to have the effect of authorizing a cavity search, it would have been preferable to state that request in the warrant application so that the reviewing magistrate clearly understood the scope of the authority that she was being asked to grant.  It is not readily apparent, and we do not decide today, that a general request to search a person for illegal drugs includes the entire range of options from a cursory pat down to the most intrusive search possible.

6

sentenced him to eighteen months' imprisonment, stayed pending appeal, and a $400 fine. Cooper filed a timely notice of appeal.

## II. DISCUSSION

[¶9] "When reviewing a trial court's denial of a motion to suppress, we review the findings of fact by the trial court for clear error and review its conclusions of law de novo. We will uphold the denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Gerry*, 2016 ME 163, ¶ 11, --- A.3d --- (citation and quotation marks omitted). Cooper asserts that when officers took him back to the motel in Wiscasset after detaining him at the Newcastle convenience store and finding nothing incriminating during their initial search, they effected an illegal de facto arrest, requiring that all evidence obtained thereafter be suppressed. We begin our review of the officers' actions by recognizing that "reasonableness is always the touchstone of Fourth Amendment analysis."[3] *Birchfield v. North Dakota*, --- U.S. ---, 136 S. Ct. 2160, 2186 (2016).

[¶10] Here, officers obtained a search warrant before initially searching Cooper at the convenience store, and then another before subjecting him to a more intrusive medical scan and potential cavity search. The existence of the

---

[3] Both the United States and Maine Constitutions protect citizens from "unreasonable searches and seizures." U.S. Const. amend. IV; Me. Const. art. I, § 5.

warrants explicitly authorizing a search of Cooper's person—the validity of which he does not challenge on appeal—is a critical factor in assessing the reasonableness of the officers' conduct, and it distinguishes the decisions of the United States Supreme Court on which Cooper principally relies.[4] *See Massachusetts v. Upton*, 466 U.S. 727, 733 (1984) ("[O]nce a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case."); *State v. Bouchles*, 457 A.2d 798, 802 (Me. 1983) (Carter, J., dissenting) (recognizing "the constitutionally mandated preference for a warrant in the case of any search").

[¶11]   In an opinion that we find persuasive, the Supreme Court of New Jersey decided a case similar to the case at bar.   *State v. Watts*, 126 A.3d 1216 (N.J. 2015).   In that case, police officers, who had a search

---

[4] Cooper points to two decisions in particular: *Bailey v. United States,* --- U.S. ---, 133 S. Ct. 1031 (2013), and *Rodriguez v. United States*, --- U.S. ---, 135 S. Ct. 1609 (2015).  In *Bailey*, the Court held that "[t]he categorical authority to detain incident to the execution of a search warrant [articulated in *Michigan v. Summers*, 452 U.S. 692 (1981),] must be limited to the immediate vicinity of the premises to be searched."  133 S. Ct. at 1041.  *Bailey* is inapplicable here because the search warrant in that case authorized only a search of premises, not of the defendant.  *Id.* at 1036; *see State v. Watts*, 126 A.3d 1216, 1226 (N.J. 2015) ("*Bailey* does not apply to a case involving a search warrant for a person.").  The *Rodriguez* Court, analyzing a dog sniff conducted after the completion of a routine traffic stop, held that "[a] seizure justified *only* by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation."  135 S. Ct. at 1612 (emphasis added) (alterations and quotation marks omitted).  As the motion court concluded, *Rodriguez* is distinguishable from these facts because this is not a case involving a question of "whether police . . . may extend an otherwise-completed traffic stop, *absent reasonable suspicion*," *id.* at 1614 (emphasis added), but rather concerns the detention of a person whom a judge determined should be searched based on probable cause that he was in possession of illegal drugs.

warrant for both Watts and his apartment, detained him as he exited a liquor store, patted him down for weapons, and took his keys.  *Id.* at 1219-20.  He was then handcuffed, placed in a police car, and taken back to his apartment; when he exited the vehicle, four bundles of heroin fell out of his pant leg.  *Id.*  Watts moved to suppress evidence of the heroin, asserting that the police had no authority to search him further after the initial pat down yielded nothing incriminating.  *Id.*  The high court rejected the trial court's "all-or-nothing approach" that "police had one shot to conduct the search correctly," *id.* at 1221, 1224, holding that

> [t]he police were armed with a warrant to search defendant's person for drugs.  The police officers were not required to conduct a highly intrusive search of defendant on a public sidewalk in full view of pedestrian and vehicular traffic.  Such a search would have offended defendant's dignitary interest and would have been contrary to the police interest in conducting a thorough search in a safe and secure setting. Patting down defendant for weapons before transporting him in a police vehicle was a necessary precaution . . . . The initial search was limited in scope and did not bar the police from moving defendant to a more controlled location to complete the search for drugs in accordance with the warrant.
>
> . . . .
>
> A warrant for the search of a person carries with it implicit authority to detain that person for a reasonable period to complete the objective of the search.  The period of the detention, however, must directly correspond to the purpose of the search and may not extend beyond that time.

. . . .

> [T]he . . . Constitution [does not] forbid[] the police from moving the individual to a secure and private setting where the search can be conducted without exposing the person to public degradation and the police to potential dangers.

*Id.* at 1219, 1223-24.

[¶12] Applying these principles to the motion court's decision, the court did not err in concluding that Cooper's continued detention was authorized by the original warrant to search him for illegal drugs. The facts found by the court, which are supported by evidence in the record reviewed in the light most favorable to the court's order, *see Gerry*, 2016 ME 163, ¶ 2, --- A.3d ---, establish that Cooper was initially detained at the convenience store and patted down for weapons, a search properly characterized as "an incidental search preliminary to fulfilling the main objective of the warrant—a search of defendant for the presence of drugs and related paraphernalia." *Watts*, 126 A.3d at 1225.

[¶13] After a twenty-minute conversation with Agent Quintero, Cooper was taken to the motel twelve minutes away, where a search of his room was in progress. Quintero testified that there were several reasons for taking Cooper back to the motel that were related to the effectiveness and efficiency of the search, including that law enforcement manpower was most concentrated there; Cooper's car and companion were taken there; the first

warrant authorized a search of the motel room for drugs; it was a midpoint between the convenience store and the location of the drug dog that was on the way; and it is common practice for the officer executing a search warrant on a person to be present for the search of the person's room.

[¶14]  A schedule W drug (Suboxone, which contains buprenorphine, *see* 17-A M.R.S. § 1102(1)(I) (2016)), claimed by Cooper's companion, was found during the room search.  The court found Quintero credible when he testified that pursuant to the Attorney General's written policy, officers purposely proceeded incrementally toward a strip search and potentially to a body cavity search rather than taking that extreme step immediately.[5]  Their call for a drug dog, which arrived during the search of Cooper's room, was a reasonable part of that process—Quintero said that when a dog alerts, a person carrying drugs will often give up and produce them, obviating the need for more intrusive measures.  Another MDEA agent involved in the room search testified that drug dogs are a scarce resource and are not called out until they are

---

[5]  Pursuant to 5 M.R.S. § 200-G(1) (2016), the Attorney General has promulgated written rules governing procedures that law enforcement officers are to follow when conducting strip searches and body cavity searches.  8A C.M.R. 26 239 001 (2007).  Those rules require, inter alia, that body cavity searches be conducted pursuant to a search warrant, absent exigent circumstances or consent. *Id.* § II(2).  There is no suggestion that the officers who searched Cooper did not properly follow the Attorney General's rules in this case.

needed, so in this case officers did not have a dog standing by when the decision was made to detain Cooper at the convenience store.

[¶15] The dog alerted on Cooper, further adding to the justification for his continued detention, and he was taken to the jail, two miles away, for a strip search. His conduct during that search, which an objective observer could only view as a desperate attempt to hide something inside his body, led to a magistrate's finding of probable cause and a second warrant authorizing the CT scan and cavity search that resulted in Cooper producing the drugs that he was carrying.

[¶16] Contrary to Cooper's argument, the initial pat down, the dog sniff at the motel, and the strip search at the jail were not independent events requiring separate justifications, but rather all part of the search authorized by the first warrant. The CT scan, if not justified by the first warrant,[6] was authorized by the second. Because Cooper's detention during that ongoing process was reasonable when exercising the authority granted by the search warrants, it did not offend the Fourth Amendment. *See Watts*, 126 A.3d at 1226 (concluding that when drugs were discovered "it was not a second search but

---

[6] As discussed earlier, because the second warrant authorized the CT scan, and would have authorized a cavity search had one occurred, we need not decide the full scope of the first warrant.

the reasonable continuation of a search that had not been completed" when defendant was initially patted down and then transported).

[¶17]  Having reached that conclusion, we do not address the State's alternative argument that even if detaining Cooper after the initial seizure at the convenience store was not authorized by the first warrant, the detention was nonetheless lawful as an investigative detention, and/or because probable cause existed to arrest him.

The entry is:

Judgment affirmed.

Justin W. Andrus, Esq. (orally), and Andrei R. Maciag, Esq., Andrus Law, LLC, Brunswick, for appellant Allen J. Cooper

Janet T. Mills, Attorney General, and Johnathan G. Nathans, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Lincoln County Superior Court docket number CR-2014-442
FOR CLERK REFERENCE ONLY