MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2026 ME 2
Docket:        Cum-24-86
Argued:        November 13, 2025
Decided:       January 13, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

STATE OF MAINE

v.

SAAD ZACKARIA

CONNORS, J.

[¶1]  Saad Zackaria appeals from a judgment of conviction for one count of aggravated assault with a dangerous weapon (Class A) and two counts of assault with a dangerous weapon (Class C) entered by the trial court (Cumberland County, *J. French, J.*) following a jury trial.  *See* 17-A M.R.S. § 208(1)(B) (2025); 17-A M.R.S § 207(1)(A) (2025).  On appeal he asserts that the trial court erred in denying his motion to suppress evidence obtained at Preble Street Resource Center and his motion to dismiss for failure to provide a speedy trial.  We affirm.

## I. BACKGROUND

### A.    Incident and Arrest

[¶2]  The following facts, which the court found in denying the motion to suppress, are adequately supported by the record when viewed in the light most favorable to the order on the motion.  *State v. Gerry*, 2016 ME 163, ¶ 2, 150 A.3d 810.

[¶3]  On June 15, 2021, the Portland police spoke with two people who reported that they were on Congress Street when they had been hit from behind by a man.  Both felt a sharp pain, and one sustained a wound on her back after being poked.  The victims described the assailant in roughly the same way—as an African-American male with short spiky hair, wearing a green shirt.  One of the victims noted that the assailant carried a backpack and tablet.

[¶4]  Based on these descriptions, officers were able to determine that the assailant was likely Saad Zackaria and that he was likely at Preble Street Resource Center.  The officers went to the center, which was closed due to the pandemic, though staff had allowed Zackaria to use the shower and the facility.

[¶5]  The center's staff let the officers in, and the officers found Zackaria, fully dressed, at a sink in the common area, located just across from the shower room.  The door to the shower room was open.  The officers asked to speak to

Zackaria, at which point he walked toward the shower room. Zackaria entered the shower room but left the door ajar as the officers waited outside. The door was open wide enough for the officers to see that Zackaria was picking items up off the floor. After waiting for a brief time, one of the officers opened the shower room door and asked Zackaria to exit so that the officers could determine if he had anything that could be used to "poke" them. After Zackaria left the shower room, the officers saw a sharp object on the floor. Evidence technicians subsequently inspected the items on the floor, which included tweezers, a box cutter, and a wire. The officers then arrested Zackaria.

**B.     Procedure**

[¶6]  Zackaria was charged by complaint in June 2021 and was indicted on August 5, 2021. The court found him incompetent to stand trial on August 11, 2021. On March 16, 2022, the court found that he had been restored to competency.

[¶7]  On June 8, 2022, Zackaria filed a series of motions including a motion to suppress. A hearing was held on August 25, 2022, and the court (Cumberland, *McKeon, J.*) denied the motions on November 21, 2022.

[¶8]  Zackaria requested the withdrawal of his counsel on December 30, 2022, and the court granted the request on February 3, 2023.

4

After new counsel was appointed and jury selection was scheduled for September 13, 2023, then-appointed defense counsel was involved in a serious car accident and new counsel was appointed. Jury selection was continued to December 11, 2023. After the jury was selected, four jurors indicated that they would not be able to sit for the dates of trial and the court declared a mistrial.

[¶9] In December 2023, Zackaria filed several motions, including a motion to dismiss for undue delay or, in the alternative, for a new bail hearing. The court (*J. French, J.*) held a hearing on the motions on December 21, 2023, and denied the motions on January 4, 2024.

[¶10] A jury trial was held from January 10 to 12, 2024, and the jury found Zackaria guilty on all counts. The court sentenced him to six years of incarceration, with all but thirty-three months suspended, and four years of probation. Zackaria timely appealed.

## II. DISCUSSION

**A.     The court did not err in denying Zackaria's motion to suppress.**

[¶11] When evaluating a trial court's ruling on a motion to suppress, "we review the court's factual findings for clear error and its legal conclusions de novo." *State v. Marquis*, 2018 ME 39, ¶ 15, 181 A.3d. 684; *State v. Lovett*, 2015 ME 7, ¶ 6, 109 A. 3d 1135. We "will uphold the court's denial of a motion

to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Ormsby*, 2013 ME 88, ¶ 9, 81 A.3d 336 (quotation marks omitted).

[¶12] The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.[1] This right is violated when the government unlawfully searches a space in which an individual has a reasonable expectation of privacy. *See State v. Akers*, 2021 ME 43, ¶ 25, 259 A.3d 127. Zackaria asserts that he had a reasonable expectation of privacy in both the shower room and in the common area of Preble Street Resource Center.[2]

---

[1] Zackaria has invoked his rights only under the Fourth Amendment, not that federal provision's counterpart in the Maine Constitution, art. 1, § 5.

[2] Whether one has a reasonable expectation of privacy is a two-part inquiry in which we ask "[f]irst, has the individual manifested a subjective expectation of privacy in the object of the challenged search; and second, is society willing to recognize that expectation as reasonable?" *State v. Bridges*, 513 A.2d 1365, 1367 (Me. 1986). Each stage of this two-part inquiry carries a different standard of review. At the first stage, the inquiry into whether an individual has a subjective expectation of privacy involves a finding of fact and, therefore, is reviewed for clear error. *See, e.g.*, *id.* at 1367-68. (finding that where the facts did not suggest that the defendants took measures to conceal their activities from public view, the trial court could not properly find that the defendants had a subjective expectation of privacy). The second stage, whether such an expectation is one that society is willing to respect, is a legal question that we review de novo. *See, e.g.*, *State v. Sylvain*, 2023 ME 5, ¶ 11, 814 A.2d 984 (stating that objective reasonableness of suspicion is a question of law).

The parties in this instance failed to address the first stage of this inquiry, and no findings were made by the court as to whether Zackaria had a subjective expectation of privacy. Although this does not impact the outcome given that the defendant's argument fails at the second stage, ordinarily, both stages ought to be addressed. Because no finding was made regarding Zackaria's subjective

6

[¶13]  Whether one has an objectively reasonable expectation of privacy is determined based on the totality of the circumstances.  *State v. Sargent*, 2009 ME 125, ¶10, 984 A.2d 831 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). We conclude that under the circumstances presented here, Zackaria did not have a reasonable expectation of privacy in the shower room or in the common area.

[¶14]  Preble Street Resource Center is a day shelter; thus, none of the protections recognized as to overnight guests come into play.  *See State v. Carton*, 2016 ME 119, ¶ 16, 145 A.3d 555 ("[T]he United States Supreme Court has generally recognized that an overnight guest in a home has a reasonable expectation of privacy in that home."); *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) ("Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy . . .")  Zackaria produced no evidence as to why he would have any expectation of privacy when invited into the center for only a brief day visit and not to use as his residence, even if only temporarily.  *See Cmty. for Creative Non-Violence v. Unknown Agents of U.S. Marshals Serv.*, 791 F. Supp. 1, 6 (D.D.C. 1992) (concluding that overnight resident of shelter had expectation of privacy); *Prophete v. Acevedo-Smith*, 743 F. Supp. 3d 440, 447

expectation of privacy, we review, de novo, only whether Zackaria had an objectively reasonable expectation of privacy.

(E.D.N.Y. 2024) ("Prophete did not lose all reasonable expectations of privacy simply because he resided at a shelter."); *see generally* Steven R. Morrison, *The Fourth Amendment's Applicability to Residents of Homeless Shelters*, 32 Hamline L. Rev. 319, 425 (2009).

[¶15]  An individual who is not an overnight guest might still have a reasonable expectation of privacy in the property of another.  *State v. Filion*, 2009 ME 23, ¶ 12, 966 A.2d 405.  When considering whether a non-overnight guest has such a reasonable expectation, we consider "whether the defendant had possession or ownership of the property, the defendant's prior use of the property, whether the defendant's presence on the property was legitimate, the defendant's ability to control or exclude others from using the property, the defendant's access to the property in the owner's absence, and the defendant's subjective expectation of privacy."  *Id.* ¶ 13.  Here, Zackaria did not have any ownership rights over the center and did not have the right to exclude the officers that staff allowed into the facility.  He had no objectively reasonable expectation of privacy at least as to any common area of the center.  *See Walker v. Gatsios*, No. 19 C 6072, 2024 WL 4476118, at 3 (N.D. Ill. Oct. 11, 2024) (holding that defendant had no reasonable expectation of privacy in conference room in a shelter, collecting cases regarding common areas).

[¶16]  This leaves only the more targeted question of whether Zackaria had any reasonable expectation of privacy in the shower room where the seized objects were located.  Other jurisdictions have determined that under certain conditions, individuals have reasonable expectations of privacy in spaces such as public-restroom stalls.  *See People v. Vinson*, 161 A.D. 3d 493, 494 (N.Y. App. Div. 2018) (holding that defendant had a right to privacy in a single occupancy restroom when the door was closed); *State v. Limberhand*, 788 P.2d 857, 861 (Idaho Ct. App. 1990) ("It is clear beyond question that, after *Katz,* clandestine or surreptitious surveillance into a closed restroom stall constitutes a fourth amendment search."); *City of Tukwila v. Nalder*, 770 P.2d 670, 674 (Wash. Ct. App. 1989) ("When a person enters a toilet stall and closes the door, he has an expectation of privacy which 'society would recognize as objectively reasonable.'" (quoting *State v. Biggar*, 716 P.2d 493, 495 (Haw. 1986)).

[¶17]  Here, however, the shower room space was not invaded when Zackaria was using the shower room to shower.  He was fully dressed and outside the shower room when the police arrived, at which point he had left the subsequently seized objects in the shower room, with the door open, while he engaged in activities outside the shower room.  Under these circumstances, as

counsel for Zackaria conceded at oral argument, no reasonable expectation of privacy as to the shower room existed at that moment.

[¶18] Zackaria argues, however, that he regained a reasonable expectation of privacy when he went back to the shower room. But Zackaria left the door to the shower room partially open, enabling the police to see that objects were strewn on the floor. Even if we assume that society would recognize a reasonable expectation of privacy in a shower room after the use of that room for the purpose of showering has been completed and the user has exited—a dubious proposition, *see State v. Mudloff*, 36 P.3d 326, 328 (Kan. Ct. App. 2001) ("[A]n individual can assert a subjective expectation of privacy in a public bathroom stall, but society will not recognize that expectation as reasonable if the stall's occupant is engaged in activity other than the stall's intended use.")—there was no reasonable expectation of privacy when, re-entering the shower room, he left the door of the shower room partially open. In *Vinson*, *Limberhand*, and *Tukwila*, one of the facts that the courts considered when reaching their conclusions that the claimants had a reasonable expectation of privacy was that the doors to the spaces searched were fully closed. *Vinson*, 161 A.D. 3d 493, 494 (N.Y. App. Div. 2018); *Limberhand*, 788 P.2d 857, 861 (Idaho Ct. App. 1990); *City of Tukwila*, 770 P.2d

670, 674 (Wash. Ct. App. 1989). Here, moreover, the door was left open wide enough for the police to see that there were objects strewn on the floor of the shower room at a time when the police had reasonable suspicion that the objects could include sharp devices evidencing a crime and which could pose a safety threat to them.

[¶19] For these reasons, looking at the totality of circumstances, we affirm the court's rejection of Zackaria's motion to suppress.

## B. Zackaria was not deprived of his right to a speedy trial guaranteed under the Maine Constitution.

[¶20] Zackaria contests the trial court's denial of his motion to dismiss for failure to provide a speedy trial as guaranteed by article I, section 6 of the Maine Constitution.[3] We review his claim for abuse of discretion. *State v. Christen*, 2009 ME 78, ¶ 14, 976 A.2d 980.

[¶21] The balancing test we employ when considering speedy trial claims examines four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the right, and (4) prejudice.[4] *State v.*

---

[3] The right to a speedy trial exists under both the Maine Constitution and the Sixth Amendment of the United States Constitution. Zackaria asserts only his right under the Maine Constitution. We cite federal case law herein, therefore, only to the extent that we consider these federal interpretations of the analogous federal provision persuasive. *State v. Athayde*, 2022 ME 41, ¶ 20, 277 A.3d 387.

[4] This test is similar to the test applied when evaluating federal constitutional speedy trial claims, *see, e.g.*, *Barker v. Wingo*, 407 U.S. 514, 530-31 (1972), although "we have noted 'nuances' that cause

*Norris*, 2023 ME 60, ¶ 14, 302 A.3d 1.

### 1. The delay was sufficiently long to consider the other factors.

[¶22]  In conducting a speedy trial analysis, a court will first look to the length of delay and determine whether it was long enough to warrant consideration of the other three factors.  *State v. Engroff*, 2025 ME 83, ¶ 28, 345 A.3d 91.  We have not explicitly stated how long a delay must be in order to proceed with the inquiry but have noted the federal presumption that a delay of one year is sufficient to initiate a speedy trial analysis weighing the other three factors.  *See id.*; *State v. Norris*, 2023 ME 60, ¶ 23, 302 A.3d 1.[5]

[¶23]  More than thirty months passed between when Zackaria was charged and when he was tried.  This was a relatively straightforward case, and the delay was sufficiently lengthy to trigger review of the other factors.

---

factors to be weighed differently under the Maine test."  *State v. Engroff*, 2025 ME 83, ¶ 26, 345 A.3d 91.  One difference between the tests is that under the Maine Constitution, failing to assert or to attempt to assert the right to a speedy trial can be determinative.  *Winchester v. State*, 2023 ME 23, ¶¶ 29, 33, 291 A.3d 707.

[5]  We have eschewed bright lines and made clear that such a presumption is not required under our Constitution.  *Winchester*, 2023 ME 23, ¶¶ 27, 37, 291 A.3d 707.  *See generally* 21A Am. Jur. 2d *Criminal Law* § 934 ("Simply to trigger the speedy trial analysis, the accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay. This generally requires a delay that approaches one year although some jurisdictions require a shorter amount of time and others longer.") (citing *State v. Taylor*, 869 N.W.2d 1, 19 (Minn. 2015) (sixty days from the date of the demand for a speedy trial); *Claiborne v. State*, 176 So. 3d 769, 775 (Miss. 2015) (270 days); *State v. Maloney*, 354 P.3d 611, 616 (Mont. 2015) (200 days); *State v. Spearman*, 283 P.3d 272, 277 (N.M. 2012) (to be presumptively prejudicial, a delay must be one year in simple cases, fifteen months in intermediate cases, and eighteen months in complex cases).

**2.** **Most of the reasons for the delay were not attributable to either the defendant or the State.**

[¶24]  Periods of delay occasioned by the accused should not be counted against the State, while delays attributable to the State include court backlogs. State-attributed delays are weighed more heavily against the State when the delays are animated by an intent to prejudice the defendant.  *See Engroff*, 2025 ME 83, ¶ 30, 345 A.3d 91; *Norris*, 2023 ME 60, ¶ 24, 302 A.3d 1.

[¶25]  Here, there were myriad reasons for the delay in Zackaria's trial. A few can be attributable to the defendant; the rest were primarily caused by factors outside either party's control.  S*ee supra* ¶¶6-10.  Some delay due to his filing of pretrial motions can be attributable to Zackaria, as can a delay caused by appointment of new counsel by Zackaria's choice.  The need to appoint new counsel because of an accident that his attorney suffered was not precipitated by any conscious conduct on his part, nor was it attributable to the State.  For seven months, Zackaria was found incompetent to stand trial.  Given that an incompetent defendant cannot be tried, *State v. Furrow*, 424 A.2d 694, 698 (Me. 1981), the reason for this delay cannot be attributed to the State, although it also was not caused by a conscious choice on Zackaria's part.  In the same vein, that a mistrial had to be declared after a number of jurors indicated that

they were unable to sit for the trial date also cannot be attributed to conduct by either Zackaria or the State.[6]

[¶26]  Viewed holistically, most of these delays were attributable to neither Zackaria nor the State.  We give some weight to fact that at no time did the State engage in dilatory conduct, and a few of the delays can be fairly attributed to choices that Zackaria made.

### 3.    Zackaria asserted his right to a speedy trial.

[¶27]  Zackaria filed a motion to dismiss on speedy trial grounds and attempted to assert the right on numerous occasions prior to the formal motion.  *See Winchester*, 2023 ME 23, ¶ 29, 291 A.3d 707 ("Given the weight of this factor under the Maine Constitution . . . we must look not only to whether the defendant *actually* asserted the right to a speedy trial but also to whether the defendant *attempted* to assert the right to a speedy trial.") (emphasis in original).

### 4.    Although the pre-trial detention was lengthy, Zackaria's ability to mount his defense was not impacted by the delay.

[¶28]  The final factor to be considered when evaluating a speedy trial

---

[6] The speedy trial clock does not begin to run anew after a mistrial, but here there was no lengthy delay between the first aborted trial and the second.  *See State v. Castro*, 402 P.3d 688, 693 (N.M. 2017) (concluding that a delay of thirty-two months between a mistrial and a second trial was "particularly disturbing").

claim is prejudice to the defendant. Three harms that we have identified that the right to a speedy trial seeks to prevent are "(1) undue and oppressive incarceration prior to trial; (2) the accused's anxiety and concern accompanying public accusation, and (3) impairment of the accused's ability to mount a defense." *Winchester*, 2023 ME 23, ¶ 30, 291 A.3d 707.

[¶29] Because Zackaria did not have the resources to pay his bail, he remained incarcerated for over thirty months prior to trial. This is a lengthy time to be subject to pre-trial incarceration, and the length of pre-trial incarceration is a significant factor under the Maine Constitution. *See id.* ¶¶ 31, 56. Beyond the length of time involved, however, there is no argument or indication that the incarceration was undue or oppressive because the bail amount was not appropriate or conditions of the incarceration were unusually harsh. *See State v. Kirn*, 530 P.3d 1, 13 (Mont. 2023) (stating that "being held on appropriate bond militates against oppressiveness" and noting that nothing in the record showed that the defendant experienced overcrowding or inadequate conditions while incarcerated); *Hakeem v. Beyer*, 990 F.2d 750, 761 (3d Cir. 1993) ("[W]ere the oppressiveness of such conditions to worsen or the treatment of the accused to fall below established, standard levels, so as to place the physical or mental integrity of the accused in jeopardy for example, the

length of pretrial delay which a just system in a civilized society could tolerate would have to be reconsidered."); *Taylor v. State*, 792 S.E.2d 101, 108 (Ga. App. Ct. 2016), *aff'd*, 810 S.E.2d 113 (Ga. 2018) (analyzing prejudice and concluding that the speedy trial right was not violated, noting that there was "no evidence that [the defendant] was exposed to substandard conditions while incarcerated, such as a lack of adequate food, climate control, proper medical care, or cleanliness"); *United States v. Ogiekpolor*, 122 F.4th 1296, 1308 (11th Cir. 2024) (stating that "[o]ther circuits have suggested that to show actual prejudice a defendant must demonstrate that the delay in trial resulted in substandard conditions of confinement or other consequences of the detention").

[¶30]  Most importantly, neither before the trial court nor to us has Zackaria argued, let alone identified any evidence in the record supporting any suggestion, that his defense was hampered in any way from the delay, such as through witnesses' loss of memories.

[¶31]  The court applied the correct law and, balancing the relevant factors, concluded that the right to a speedy trial was not violated.  We find no abuse of the court's discretion.  *See Engroff*, 2025 ME 83, ¶ 39, 345 A.3d 91 ("On review, we conclude that based on the court's findings and conclusions with

respect to the four factors, the court did not abuse its discretion in denying [the defendant's] state speedy trial claim.")

### III. CONCLUSION

[¶32]  Both of the arguments presented—based on the Fourth Amendment and asserting the right to a speedy trial—involve particularly fact-sensitive inquiries.  As to the first argument, we make no general pronouncement as to the scope of privacy rights under federal law relating to shelters for the unhoused.  Instead, our conclusion that Zackaria lacked an objectively reasonable expectation of privacy is based on the totality of the specific circumstances reflected in the record before us.  The speedy trial claim is governed by a test in which the court applies a balancing test that similarly examines the specific facts presented; our review is only for abuse of discretion; and the court's ruling that the right was not violated was sound.

The entry is:

Judgment affirmed.

---

Michelle R. King Esq. (orally), Thistle Weaver & Morris, Portland, for appellant Saad Zacharia

Jaqueline Sartoris, District Attorney, and Grant S. Whelan, Asst. Dist. Atty. (orally), Prosecutorial District Two, Portland, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2021-2456
For Clerk Reference Only